International Trade Commission, Appeal 1386 from the year 2007. Counsel, we're ready for you. We're sure ready. Welcome to the court. Good afternoon to you. Please proceed. Good afternoon, Your Honor. Eric Wiedenberg on behalf of Trinco, Prince of America. May it please the Court. Philips and Sony entered into an agreement. They entered into an agreement that Philips would license its patents, and in consideration for a substantial share of the royalty from that licensing program, Sony would give Philips the rights to license Sony's patents, and would agree not to license its patents at all. Has Prince Princo sought a license from Sony? It did seek a license from Sony, yes. And it was denied? Princo intends to use the technology in the Sony patents? Princo sought a license from Sony after the Taiwanese Federal Trade Commission ordered that the pool be broken up, and it was only after that point that Princo was able to approach Sony and secure a license to Sony's patents. That's really what I'm trying to understand and what I find confusing about all of this. I didn't see anything in the record suggesting that Princo intended to use the technology developed by Sony rather than the technology developed by Philips. One thing that is established is that what's required to practice the standard, what's called the Orange Book Standard, are only Philips' patents. Precisely. Is that the reason for my question? Yes. That's the answer to your question. It is not necessary to practice Sony's technology in order to create an Orange Book CD-R consistent with the Orange Book. You don't need Sony's technology, that's correct. That's why I'm trying to understand and have found really quite confusing the interest of Princo in complaining about the availability of a license under the Sony patents. Well, the original complaint was that we had no opportunity when we entered into the license to individually negotiate licenses with Philips or Sony or for some of the patents or all of the patents or some subset. At the time we entered into the agreement, it was an all-or-nothing proposition. It was a pooled set of patents. So we had no option at that point. So the notion of whether or not Philips could get an individual license from Sony was academic because we had already taken one for the entire pool. Well, how did the agreement harm Princo? Well, it harmed Princo in a variety of ways. One, it was the ability to pool licenses and the ability to remove this nascent technology that Sony had developed, technology that could have evolved to be a competitive force on the Orange Book standard that allowed Philips the security and the confidence to price the pools at really astronomical levels. And the record is clear that Philips priced these licenses at 10 yen at a time when these disks were selling for close to $5 a piece. So then you're saying the harm to your client, Princo, is that they had to pay more if they were going to be participants in the pool? That's correct. That's one of the harms. And what was the proof that they would have to pay more? Well, the proof would be in the unprecedented levels of royalty payments that... No, I don't mean what the proof would be. What was the proof that you were so harmed, had to pay more than you should have had to pay? The proof is that we existed in a non-competitive market. The proof is then we were unable to possibly reap the benefits of competitive pressure applied by an alternative standard to the Orange Book. Those are the harms. But what proof was there that the competitive alternative could have been devised? Well, on this point, Your Honor, I think the cases of Standard Oil and Microsoft... No, I'm asking about factual matter in the record. I'm asking about what evidence below did you produce to show? We are unable to create the but-for circumstance. We are unable to manufacture or set forth evidence of the circumstances that would have obtained had there been a competitive market. What we can show is that... No, no, my question is whether there was proof in the record before the ITC, evidence, actual evidence, that an alternative technology was feasible and would be so good as to be truly competitive with the Orange Book technology. I don't believe there was evidence in the record to satisfy that standard. My concern is that's an inappropriate standard in this circumstance because we are being forced to establish the but-for market. What would have happened but for the collusion between Philips and Sony? What we were able to establish and is for the most part unrebutted is that Sony agreed to surrender its technology, competitive technology, gave it to Philips. Philips then packaged it in a way and entered into an agreement with Sony such that Sony's patents could not be used either within the context of the Orange Book license or outside of the Orange Book license, which in effect meant that technology could be used for no purpose whatsoever. It is, as the FTC points out in their brief, a classic case of two possessors of intellectual property, of patents, coming together and choosing which one would be the one that wins in the marketplace. Doesn't that sound like a Sherman 1 issue rather than a misuse issue? And isn't misuse generally use of a patent to obtain royalties beyond the term or beyond the scope of the patent? So wouldn't this be more Sherman 1 if there's anything at all rather than misuse? It could very well be a Sherman Section 1 or potentially even Section 2 if it was an attempt by Philips. But it's not misuse. I think it is misuse, and here's why. Philips makes an argument that misuse requires leveraging. I'm not entirely clear what they mean by that. But what is clear from leveraging? Well, leveraging is the use of the patent in question, which is arguably being misused. I understand that. And in that sense, there is a direct relationship between Philips' use of its patents and the resulting monopolization or the resulting suppression of technology. And here's how. The incentive for Sony to enter into this non-compete agreement was the strength of the Philips patents. The consideration for Sony to enter into that agreement was the royalties from the Philips patents. The fact that in order to practice the Orange Book standard, you had to infringe Philips' patents. But is any licensee paying more because of the inclusion of the Logitech patents? I would certainly argue yes, and we have argued that way in our briefs, both for the reason that I described before and the fact that they didn't get the benefit of a competitive market, that the royalty rates could only be seen as super competitive as the price went from $4.50 to $0.12 per disc. The royalty remained constant. Mr. West, you talked just a moment ago about how the Philips and Sony chose one and rejected the other technology. Wasn't that a great benefit to the market because it provided us a standard? And we all know that standards are a benefit to the market in a vast number of ways. Isn't this elemental to the standard-setting process that you're going to choose one and reject the other and then enforce it as they did contractually? Wouldn't your position endanger standard-setting worldwide and disrupt the marketplace? In fact, no, and a number of the amicus briefs make that same point, and here's my response to that. We don't challenge standard-settings, and we don't challenge the pull-in. But this would, wouldn't it? It does not. If I were setting the Blu-ray standard right now, I'd be watching this saying, we can't make any agreements to have a single course of conduct and shut off any others because we'll all be sued for misuse, if not anti-trust. You could certainly set the standard. There's nothing wrong with that. You could choose between technologies to go into that standard. What you can't do and what they did here is to say, we're going to put this technology in the standard, and you can't use that alternative for any purpose at all. That is the anti-competitive effect, that's the misuse that we're complaining of here. Because it didn't work, of course, according to the record that we have here. But even that aside, why wouldn't a standard-setting organization within its standard body be able to do that? Because it suppresses technologies that should be given an opportunity to challenge that standard. They could set the standard, they could market the standard, they could promote the standard, but to suppress technology that lies outside the standard, that's improper. And that's what a standard does. I have to respectfully disagree. I think what it does is it sets a benchmark, it sets a uniform approach to something, but there should always be, you would want, some competitive pressure to work on that standard. Maybe there's a better standard. But if the standard itself is inclusive of patents that do not help the standard, why haven't I got that patent included in the package at all in that particular point? If it does not compete with the standard itself. Well, I think there's no explanation to have a patent in the standard that doesn't practice the standard. Therein lies the problem with the Lagodec patent. Why was it included? And our proposition, and we submit to the court, it was included in the pool because it couldn't be used in the pool and subject to a non-compete agreement so it couldn't be used outside the pool. Does claim six of the Lagodec patent dominate the Orange Book standard? Categorically, no. And this issue has been in front of the commission who elected not to decide that issue, instead resolving the question on different grounds. This court is unanimously found the other way, hasn't it already? It is found on a partial reading of the claims that a reasonable manufacturer might have wanted it in the pool. We have submitted evidence that shows there are claim limitations that would not permit that interpretation. We certainly appreciate and understand why you want to use a proxy when there is not a clear definition of what the claim is. But here we have an unrebutted construction of claim six, which establishes that that key requirement of a frequency in order of magnitude lower cannot be consistent with the Orange Book. But the issue, even if it can be construed that way, that doesn't address the problem of the non-compete. Everybody agrees that... So, as I understand your argument, inclusion in the pool of a patent that isn't relevant to the technology that's ultimately adopted as the standard is the problem. Is that right? That's what I understand your argument to be? It's part of the problem. So my question is, which patent then is being misused? Every one that's in the pool or the one that's included that isn't used? All the patents that comprise the power, the ability of Cranko to entice Sony into this deal. The patents that comprise the essential patents, the patents you need to practice the Orange Book. That's what fill us in effect. So every patent in the pool that is used in the direction of the standard is now being misused because of the inclusion of the one patent? At a minimum, the fill us patents that are essential to practice the Orange Book. How is that different from any of the other patents? Your view is all of the patents in the pool would be necessary to practice it, but for the ones that are added inappropriately. So then it seems to me that your argument, its natural conclusion is that everything in the pool is being misused. That's a fair interpretation. I'm going to diverge a little bit from your premise. Not every patent in the pool is necessary in order to manufacture an Orange Book CD. Some are what we call essential. There's now a definition out of the first fill us decision about how to resolve that issue, but it's clear that there are some patents in the pool that are not dictated by the standard. They're not contrary to the standard. They're optional, and there may or may not be patents outside the pool that compete with it and are viable and appropriate for the test set under fill us one. But there's a difference between the technological necessity of practicing the Orange Book standard and optional patents. So the minimum of patents that fill us is using to market the license are the ones that are being misused. They're the ones that are used to entice Sony into this deal. They're the ones that generate the royalty revenue from which Sony is being paid off. They're the ones that are necessarily infringed if you want to practice the Orange Book standard. Is there any evidence in the record to show that the lackadaisical patent would have been a viable technical alternative to the Orange Book CDR? We believe there is, Your Honor. We've said it out of our brief. But in summary, there were some comments made by Phillips' witnesses criticizing the Lagodec technology. Some of that criticism was not about the patent technology. It was about technology in an 86 production that was shared with Phillips. Which ones of the witnesses are you referring to? Primarily Mr. Hesselman. Was he aware of the Lagodec patent when he was testifying, or was he testifying from a technical standpoint? He was aware. He was testifying during this proceeding. So he was, in effect, testifying in defense of the RayMaker competitive patents and clearly had a motive to criticize the Lagodec patents. So he criticized the 86 proposal. He also made some broad comments that I think are nothing more than broad comments about the fundamental physics of the Lagodec patent. But despite that, and despite the fact that the Lagodec technology was, so to speak, projected by Phillips and Sony, Sony proceeded to patent that technology, not only in the United States, but in Japan. And as we point out in our briefing, the specifications of that patent have now been cited in subsequent patents as the preferred servitory for digital demodulation. So in addition to the presumptions that must follow the issuance of a patent, as utility, as capable of being used for its purposes, there is a history to this technology that certainly suggests that it was technologically viable. I take it that there are some circumstances, you would agree, in which a joint venture can agree, the parties to the joint venture can agree not to compete with the joint venture. And therefore, in a situation analogous to this, in appropriate circumstances, it would be fine for one party to the joint venture to agree not to license its competing technology, competing against the technology that the joint venture has developed. What are the limits on that proposition as you see them? Exactly right. And here are the limits. The limits are both clearly set out in the PolyGram case. And in that case, as you recall, it was PolyGram and Warner came together and they wanted to co-distribute the 1998 publication of The Three Tenors. PolyGram had owned the 1990. Warner had owned the 1994. They came together as a joint venture to market the 1998. Where they went astray, which is directly parallel to this, is in an effort to enhance the profitability of their joint venture, the bonafide joint venture, they decided they would limit the marketing of their individual assets of the 1990 recording and the 94. That's where the Federal Trade Commission, and then affirmed by the Court of Appeals, said, you've gone too far. That's presumptively unlawful. That's exactly what happened here. It's important to... But that's because of the timing of the events, that is to say, the timing of the beginning of the joint venture, the inventive work, and the ultimate patenting, whether the joint venture came later as opposed to earlier? Is that what the key is in your view? In PolyGram, no. It's important, but that's the point. It's important to understand what happened with Phillips and Stoning. When Phillips began to pursue CDRs in about 1983 or 84, about a year after that, they went to Stoning and said, hey, we've got this idea about CDRs. Stoning almost commenced that process. Stoning had a CDR program underway. They then talked in 86 and 87. But during none of those discussions was there an idea that there would be a non-compete, there was no co-mingling of assets, there was no merging of resources to come up with the patents that came out of that. Indeed, what came out of that process were not patents issued to Phillips and Stoning or to inventors by Phillips and Stoning. They were individual assets of the two companies. By the time the 1993 agreement to not compete arose, they could have gone their separate ways. There was no encumbrance whatsoever on either of those parties to take their intellectual property. Phillips has now argued for the first time at the en banc stage that there was in fact a joint venture and that the agreement not to compete was an ancillary restraint to further that. And remember that the agreement not to compete goes to the patents themselves. That was being encumbered by that agreement. So your theory is that it's irrelevant whether the digital technology is competitive at all? Is that right? No, it's not irrelevant at all. Two entities came together about competing ways of... Well, that's why I asked whether Finco wanted to switch to the digital technology, having taken the position throughout that they are operating, wish to operate, and are operating under the analog. The problem with your hypothetical question is this agreement not to compete entered into in 1993 basically shut out the ability of any digital-based standard to evolve. So by the time Finco or anybody had the option of doing that, you had a process that had been ten years in the making. I want to be sure I understand your position. It's that Sony therefore had an obligation not to agree with Phillips to work together and decide which technology were better? No. Or which technology should be the standard? No, it's fine that they work together and decide which technology they wanted in the standard. What's not fine is when they then agreed to keep that patented technology away from the public for any purposes. That's why I asked if Finco had requested and been denied a license to operate under the Agadek patent. Originally when Finco wanted to get into the market, there was no ability to select individual patents. We did not have that opportunity. It was all or nothing. You had to take all of the Phillips and Sony pooled patents or none at all. So there was no option for that question to be asked. After the pool was broken up by the Taiwanese Fair Trade Commission, then there was an opportunity to get individual licenses. But at that point, the Agadek technology had been smothered. It had been denied the opportunity to get any sort of legs. In fact, Sony was still under the non-compete agreement, even at that point, not to license Agadek for anything other than Orange Book purposes. So your answer is that the license is not desired under the Agadek patent? Certainly not for the Agadek patent. You can't use it. Your theory does not depend on Finco's developing this alternative technology. Your theory is that it's patent misuse because others, everybody in the market, was prevented from developing the alternative technology and that had an impact on the market, which in turn injured Finco. That's exactly right. I wanted to, Your Honor, finish one comment about this idea of joint assets. Because that's really the key to the PolyGram case, joint assets. And here's what Phillips said about these patents. And I'm reading now from appendix page 7953. Phillips says, It is important to stress that the pure CDR patents do not embody the result of joint research and development of Phillips, Sony, and Taiwanese. They're clearly separate assets. Under the PolyGram case, they cannot be encumbered by legitimate joint venture. On the other part of your question about timing, this is more of a question that we think also applies here. We see the principle coming out of the Polk brothers. And in that case, the question asked was, did the ancillary restraint facilitate or encourage whatever joint venture is being considered? At the point at which the non-compete agreement was entered into in 1993, the patents were done. That was all separate property. The Orange Book Standard was done. That was resolved. Now, we're not banking on the Orange Book Standard being a private asset. Whether or not that ends up being something co-written is not at all pivotal to this case. The non-compete agreement encumbered private assets. The Polk brothers and the original case, Massachusetts Board of Optometrists, California Dental Associations, all of them, even Allison Pike, back a hundred years, says if you're going to have some sort of an ancillary restraint, it must be narrowly tailored to meet, to be indexed to the pro-competitive benefit. And here, prior to the Audubon panel, there's been not a single pro-competitive benefit articulated. And now, at this stage, the only one is the idea of developing the technology, the patent. But we know those are individual assets, and you cannot use the ancillary restraint to encumber that. I see I've gone beyond my time. One quick question. Can you cite any case in which patent misuse was found based not on any anti-competitive provision in the license itself, but from some alleged anti-competitive agreement in a collateral agreement? I cannot, Your Honor. Isn't that what we have here? Because you have a license agreement and you have a separate collateral agreement, allegedly between Phillips and Sony, that has some argued anti-competitive effect. I believe, and now I'm referring to a broad statement in the Veracode and Blondertongue cases, that it's immaterial the manner in which the patents are extended. This idea that you have a vertical relationship has never been required by any Supreme Court case for patent misuse. It is not the case that Phillips patents are in any way collateral to the damage being done here. Phillips patents lie at the core of the patent misuse. They lie at the core of the agreement with Sony, at the core of the standard setting requiring that those specific patents be infringed, at the core of why a licensee would want those patents. I would not consider that to be collateral at all. It is central to the misuse here. It's central to the expansion of the Phillips patents, such that they now effectively control the digital technology. And that is what the Supreme Court prohibits in patent misuse. Counselor, you're down to about four minutes. Do you want to reserve the rest? I would like to. Thank you. Thank you very much. Ms. Keene, we'll hear from you next. Please proceed. May it please the Court, since December 2003, the only issue in this case has been whether Prinko established any of his affirmative defenses of patent misuse. Ms. Keene, suppose we hypothetically had a situation where there was standard set and there was no joint development of the technology that went into the standard setting, but you had two participants in the market who got together and agreed to pool their patents in a set of standards. Would the Commission view it as, let's take it first, an antitrust violation for them to agree to suppress a competing technology that would compete with the standard? Your Honor, that wasn't an issue before the Commission. Are you saying just lay it? Yes. Counselor, we'll need you to speak up loud and clear so everyone can hear. The Commission has no position on that question? Well, the way you phrased it, if you start from the beginning, what I understood was you said if there was a case where there wasn't any joint... Yeah, there's an issue here as to whether there was joint development at the appropriate time. So I'm trying to put that aside, and I'm saying just assume there wasn't any joint development, that two patent holders get together, set a standard, and suppress an alternative technology. Is that, as a matter of antitrust law, is that a permissible activity? Your Honor, that wasn't the question. No, but I'm not asking you a hypothetical. And so I can't tell you the Commission's position on a violation that we didn't, or a claim that we didn't decide. I'm in a box. I'm sorry. What the Commission decided was the patent abuse defenses that were put before it, which were, first of all, price fixing, time, the particular question on whether there was a combination of restraints of trade, the arguments that Prinko is now trying to rely on to say that the issue of suppression was before the Commission, but it wasn't. That's the problem. So what you're saying is you can't answer any questions other than what you say was before the Commission? I'm afraid I can't answer questions as to whether a particular, whether, and, you know, if you were to remand the issue to us and I were to answer these, then you'd be prejudging what might come down. It's like, I mean, it is a problem for us, for me. Well, you could answer the question if there were another IC, another Commission proceeding in which the Commission had decided such an issue, then you would, so I'm assuming you can't answer it because the Commission has never had that issue before it? I'm not aware of the Commission having had that issue before it, no. And the issue here is misuse, isn't it, rather than an antitrust violation? Well, that's true. But you can't answer the misuse question either, can you? Well, no. Let me say the patent misuse issue that was, why, let me explain why. If I ask you the question in terms of a hypothetical relating to patent misuse, could you answer that question? I can answer it and try. I would love to help you, Judge Geis. I'm doing my best. Please ask the question. Well, let me ask it hypothetically in terms of patent misuse. Would the Commission view it as patent misuse if, without joint development of the technology, the two patent holders got together, pooled their patents, set a standard, and suppressed alternative technology represented by the patents that they held? That wasn't the issue in the case. That's my problem. Maybe you're speculating that the question was hypothetical. We all agree it's not the issue in this case. But it's an attempt to get you to predict what you think the Commission would do if it were the issue in the case. Okay. Try again. I'm sorry. If the issue were that two patentees agreed to suppress technology, would we consider that to be a patent misuse issue? Yes. I guess there are three answers. Yes, no, or I can't say. What about refusal to deal? Say it's just one person. I have a digital and an analog patent, and I'm refusing to deal on one. Would the Commission view that as misuse? It wasn't an issue in the case. Are you not prepared to talk about anything but the waiver issue? Is that the only thing you're comfortable talking about? No, I'm happy to talk to you about every patent misuse theory that was presented in the case. I'd like to hear what you've come to tell us. Thank you, Justine. BRICCO is relying on statements that a patent pool license for orange book purposes in a non-negotiable patent pool where individual licenses are unavailable is raising a question about suppression. And that doesn't raise the question about suppression, because the fact that the same patent licenses are unavailable for each individual pool licensor means only that joint marketing has ended on competition on price for the uses within the patent pool. I don't think that's what they're complaining about. I think their complaint is the fact that you have patents in the pool which are not necessarily required to provide for the orange book standard. If that's the case, then, if there is a patent within that pool that could be made competitive to the patent pool, is that suppression of the patent or is that an illegal extension of the patent? The commission certainly considers the question of the illegal extension of patents in connection with time, but we didn't consider it in connection with what you're calling the hypothetical suppression. What we considered was whether or not there was an elimination of competition on price. And the reason for that was because they didn't make an allegation that it couldn't be used for non-orange book purposes outside the pool. That wasn't a question that was before us. Well, one question you did address was the commercial viability of Langbeck, at least. And there's an issue as to whether you addressed that in the context of its use for orange book purposes only or whether you also addressed it in connection with non-orange book purposes. But the Federal Trade Commission has filed a brief. They say that, at least in the antitrust area, that commercial viability shouldn't be the test, that there should be a less stringent test so that incipient technology isn't suppressed. What's the position of the ITC with respect to whether commercial viability is the test or whether the FTC is correct that some lower test ought to be applied? Well, the way this case was litigated was that as Prinko brought it forward, we litigated this case under the rule of reason and it was under the full rule of reason analysis. And the reason for that was because that was the standard that Prinko put forward when they were raising their rule of reason analysis. And they actually quoted windsurfing in that line of cases, the windsurfing line of cases, which said that if it wasn't per se, then we didn't have any competitive effect in a relevant market. And when Prinko argued to us about what the rule of reason standard should be, they focused on the tend to string part of windsurfing. And what we said was that they didn't need to show an actual competitive effect. And so we explained what the test for the full rule of reason standard was and that was completely consistent with the not inherently suspect part. But do you believe that commercial viability is the correct test or do you agree with the FTC that that's too stringent a test? The FTC is arguing under an inherently suspect analysis and its mission didn't use that. We didn't use why, that rule of reason standard, because that was not the one that was argued. They argued the full rule of reason standard and we found that there was no anti-competitive effect in the relevant markets that they had defined. And that was why. We didn't even reach the pro-competitive effect because they didn't. Counselor, it was asked but not answered earlier what the Commission's finding was with respect to whether the Langedeck patent was irrelevant to this technology and therefore clearly didn't belong in the pool. What is the answer to that question? The Commission found that there was no patent misuse either way under the theories that had been put forward. Did it make a finding about whether the Langedeck patent was relevant enough to the Orange Book technology to belong in the pool? We did not make a finding on the civil claim to be lax. As I explained in a lengthy discussion with Judge Goddard at the end of the last appeal, and we didn't make a finding on that. And what we found was that there wasn't any anti-competitive effect whether or not that claim. At least you found none was true, I take it. Yes. And so you held them to a strict burden of proof and then said they didn't need it, therefore, no misuse. Yes. But I take it that Judge Dyke is suggesting that there may be some circumstances, perhaps in this case or perhaps not, where there would, in effect, be a presumption of any competitive effect. Whether you want to call it suspect activity or whatever other word you might want to use. Yes. So what about that? The math board standard. Well, we believe that whether or not we're unaware, we've checked, we're unaware of any patent abuse case in the federal circuit that has applied the inherently suspect standard. We believe that that standard could be understood as being in some tensions with the windsurfing and CSRI line of cases. As we explained in our opinion, when articulating the rule of reason standards, we said that the federal circuit has indicated in cases like Virginia panel that it's going to apply any type of rule of reason standard. Of course, but since we're in vain, we could change windsurfing or any other case. Whether we will or should, that's another matter. We could. Yes. So should we or should we not and why? Well, it's a question of law and it depends on whether or not you believe that there ought to be a showing of any competitive effect. And I think it's illustrated in this case what we did in terms of the per se misuse analysis. What we were looking for was whether before we would go forward and find it in the price fixing, we required a showing of that there was actually potential competitors. And so when they raised the joining forces argument, they were saying that they had come together with an intention to develop instead of developing technology separately. And so when we looked at that, we did not see that there was – we wouldn't infer from the deposition testimony proper of the agreement that there was actually some potential agreement not to compete. We were looking – we didn't see that as evidence that they were competitors. And under the standard in blue surfing, when you're looking for any competitive effect in a relevant market, you would be requiring, it seems to us, a showing. The burden would be on the proponent of the defense to show that there actually was a potential for competition. But instead what you are going to be doing under the inherently suspects is inferring the existence of potential competition from the agreement itself. And I think that's a question of law, whether you'd like to do that. Our court has described patent misuse on a few occasions as expanding the temporal or physical scope of the patent. What is it that you understand by the physical scope of the patent? What category of cases does that encompass? And does that encompass the kind of alleged horizontal agreement at issue in this case? We took a very formal view in Phyllis 1. Right. Let's set the time aspects of it aside. I think we all understand that time is sort of the core of what physical expansion of the patent is, and it may or may not be misused depending on the circumstances. But setting aside the time cases and, of course, setting aside the temporal extension cases, do you think there is another category of cases, such as this case, for example, in which the description physical expansion of the scope of the patent applies with respect to the doctrine of misuse? I wish I could help you, but I don't think we can. I can't answer that immediately. I can't think of a different category. It would be your view that in order to reverse the commission, we would have to substantially expand our prior cases. The question really is whether there is a conflict between windsurfing and the inherently suspect analysis of the FTC. And as I said, the cases that have come out of the Federal Circuit have all applied the full rule of reason analysis, and I think it is an extension to federal law. On the other hand, by the same token, it is really a dicta as to whether the cases that didn't apply the inherently suspect analysis would actually consider that as a form of rule of reason analysis as appropriate in this case. All right. Thank you very much. Mr. Dumont, you're next. Welcome to the Court. Good afternoon to you. Thank you, Your Honor. I guess it goes without saying that there's no point in restating anything that Ms. Keene said with which you agree, but if you have important things to add, that would help us. Let me try my hypothetical out on you. Do you remember that we had a situation in which there's no joint development of technology? Two companies get together, pool their patents to set a standard, and they agree to suppress an alternative technology represented by other patents that they own. First of all, is that an antitrust violation? It could be, under particular facts and circumstances, but the important point, we think, for present purposes is the order and the content of the analysis that you do in order to get there, and the first step would not be jumping straight to—well, the first step would be for the challenger to clearly identify that the restraint is being challenged and to make some threshold set that it has an actual anti-competitive effect, and therefore it is necessary and worth it to go and do the rest of the analysis. What about under an inherently suspect standard? Doesn't your client, under that approach, have the obligation to come in and address justifications? Well, a lot of the action here on the antitrust issue, if you will, on the rule of reason issue, has to do with that threshold question. Who has the burden of articulating a problem, and then how does the order of production and the burden of proof flow from that? I don't think that we disagree. Let me just say this. I don't think that we would have to disagree with the FTC on the way that they frame the inherently suspect standard depending on how you apply it, right? And so if they require a sufficient threshold showing on a sufficient context of actual facts to really allow the court to be able to say that some confidence, all right, I've looked at this and I think this is a serious problem, then I think it may make sense to put the next burden on the pro bono restraint, the person who is defending, to come forward and justify that. But there is a lot packed into that first question, which is how much do you require the challenger to do before you engage them in an argument? Okay, so how much would you require? If there's an alternative technology, and in my hypothetical that's suppressed, does that shift the burden to come up with a justification to Phillips? In the situation that you posit, I think the answer is no, because I think it's designed to be similar to this one in the following respect. We have two parties that have agreed to collaborate on a standardization and commercialization of technology, right? Now, you stipulated that they didn't collaborate on it. Yeah, I'm putting that aside because I understand the point. Right, so it's a harder problem than we have here, but there's still legitimate joint integrative activity going on, as I understand hypothetical, and therefore an agreement by them not only to jointly commercialize the technology, but for each of them to hold aside other intercomputing technology and not to license that in competition with their own standard, that would be an ancillary restraint. It would be a classic limited agreement, not competing, purported support of pro-competitive joint activity. And under those circumstances, by articulating that, the defendant, Phillips in this case, puts that in a class of restraints, which for 100 plus years has been recognized as potentially pro-competitive. Even though there was no joint development of the technology. Even though there was no joint development. Now, it makes it a harder case when we get to the ultimate balancing, about whether it is on balance justified or not, because it may be harder for the defendant to show in your hypothetical that it was, the term being reasonably necessary, that it was reasonably necessary to facilitate or enable a collaboration. So that has to be part of the analysis. That becomes part of the analysis. Okay, how can we possibly decide that question of reasonable necessity under your theory on this record? Well, you can't, which brings us to the point of this case. There's a set of theoretical questions here that engage me on my report. They're important and you want to articulate proper principles for them. And then there's a question about what to do in this case. And that's being assigned waiver. I'm not talking about waiver. But in this case, the reason that the record is, well, we think the record favors us, such as it is. It favors us strongly. And those points are set out in our brief. But to the extent that you look at the record, and I would not blame you, and you find that there are unresolved questions, there are things you would like to know, there are witnesses you would like to have heard from. The reason that you don't have that in the record is that this issue, this agreement was never alleged when the record was open. And Phillips had no opportunity and no reason to meet this challenge. When you say disagreement, you mean an agreement to suppress a potential alternative technology? Exactly. That wasn't proved. It wasn't proven. It was never alleged. Not alleged either. And you seem to be saying that that would be step one before any burden of coming forward or burden of proof would shift to the other side. Step one is to allege it. Suppose they did. Suppose hypothetically that we conclude that they did allege it. What should we do? Should we send it back for the development of a for record, or should we try to decide it on this record? No, you should not send it back because the answer is, as the panel's opinion recognizes, if we're talking about an agreement, which we are, an agreement for Sony not to license the lab to that patent, it isn't even clear on this record whether that agreement existed. There's no finding, and the reason that there's no finding is not because Pringle asked for one and the commission refused to supply it. Now, in that situation, I would say fine, you can send it back to the commission for that finding. That's not what happened here. Because the issue was never clearly raised, but I'm asking you to assume hypothetically that it was raised. I'm asking you to assume that we can see that it was raised. And so can we decide these issues on this record, or if it was properly raised, should we be sending it back to have a proper record developed? Both on the agreement point, on the competitiveness point, on the justification point, why should those issues be decided on what you seem to agree also is a skimpy record. Because the critical question as to this case is, who bears the burden, who bore the burden of proof and who bears the risk of an inadequate record? But isn't the human question, isn't the human, isn't the, the precursor question to that, whether the discussion that you've been having with Judge Dyke, which as I understand it is in terms of antitrust, translates directly into patent misuse. Because whatever the outcome might be with respect to the antitrust liability that might flow from such an agreement, this is a patent misuse case, and the question has to be, does the horizontal agreement that is alleged, or at least that we've been talking about, does that constitute misuse of the ray maker's patents? I understood your position on that to be no. Without any of the discussion, without any of the analysis of the particular facts of the agreement, is that, am I overstating your position? No, not at all. That's exactly right. And the only thing I would add to that, we've laid out, and I can go through again, why we think this is just true, that it goes beyond any previous case, and we think there's no reason to go beyond any previous case, because the antitrust laws are there if there's a problem, and as a functional matter, the antitrust laws allow you to have a much more, they have standard requirements for a small-majority court, and they allow you to have a much more tailored remedy. In misuse, you have quite a draconian remedy, and the reason that it may make sense in the limited context in which it's been applied by the Supreme Court and this court, is that you're talking about something that's quite cavvy. You're talking only about use of the patent, if actually before the court, that the plaintiff, the patentee brought before the court, to do something that expands the patent beyond its scope, and the facts that are necessary in making this use determination will almost certainly be evident from the face of the record, from the face of the license agreement and the basic facts involved. Now, what we're talking about here is something quite different, which goes far beyond that, and will turn every case into an antitrust case. No, but are we really doing that, if in fact we have a situation where the agreement to do a joint venture for development gives rise to different types of patents, and then the patents themselves are used for a pool, and the two parties agree to only take one set of the patents versus the other, and develop only one part of the patents, and then use those patents within the pool, and leave the others out? If in fact you have two technologies, and A and B decide back in 1986 to develop one technology over the other, and that technology provides for one set of patents, another set of patents that could also be developed, and in the process you have a pool, but only the patents that are developed by one side are put in the pool, the others are kept out, even though they could be used within the pool. Is that patent misuse, or is that an antitrust violation? If all the licensors are doing with the patents that they have decided to use to license the community is enforcing them against licensees who, well, enforcing them against people who decline to take a license or are not complying with the license, enforcing them against infringers, that is not misuse. Now, if there are collateral agreements that they've made that turn out to present antitrust questions, that should be resolved as a matter of antitrust law, but there's nothing in my report that we've described, as I understand it, that involves expanding the physical or the technical scope of the patents, or that involves imposing restrictions on the licensees. Even though one technology patent was suppressed over another? Only one patent was used, and the other was suppressed? Well, yes, and I think you're right with that. You said that they jointly developed a bunch of technology, and then they picked and chose and decided which ones to use and what to market, and it seems to me that that would be a classic, it's very much like this case, really, and it would be a classic ancillary restraint case. Now, I'm not saying you necessarily survive review. You can bring that challenge, but when you articulate it, the defendant says, look, it was a legitimate decision that we made as part of our joint activity, and this was ancillary to that, and then the other side has to make a showing of an independent effect. Now, in the right circumstance, which maybe you were describing, if you have a very concentrated market, and if this is really a viable technology, maybe they commit that showing, and then maybe you end up in a debate about, on balance, should we encourage this or should we not encourage this, is this more or less pro-competitive at the end of the day? Are you suggesting we're in a lot of circumstances that could be patent misuse to try to protect the Orange Book patents and the technology that they represent from competition from other people? Could that be patent misuse of the Orange Book patents? I'm not just talking about the Rainmaker's patents. I'm talking about the entire Orange Book patents that are being asserted here. I'm sorry. I missed the beginning. I'm sorry. Could it be patent misuse? If you're asserting, let's say, in this case, the Orange Book patents, to protect those patents, to give those patents a broader scope by protecting them from competition, could that be patent misuse? We would say, no, that that is not the proper, that's not the historical, that's not a proper… But why isn't that expanding the scope of the patents? Suppose I own two patents, one analog, one digital, and I tell you, oh, you want to license the digital. You can only do it if you also license the analog. I'll bundle them together. You've got to license both, or you can't license either. Would that possibly be patent misuse? Well, yes, if you are tying the two patents together. So why are you consistently tying when you put them both in the pool, even though one of them is relevant to the standard and one of them is not? Oh, I'm sorry. Now we're getting to a very different question, I think. So, first of all, the Wagner patent is relevant to the pool, has been found to be relevant to the pool, has been found by this court to be at least arguably relevant to the pool and, therefore, legitimately in the pool. That is clearly correct. The late-breaking client construction argument we have from your brief is not correct. Okay, if it wasn't relevant to the pool, suppose… Let's try and go with a hypothetical. Suppose it wasn't relevant to the pool. Now would it be patent misuse? You've got… If you have a plausible theory about why, by including it in the pool, you imposed conditions on the licensees that were any competitive and effectively expanded the scope of the legitimate patents, you can make out a misuse case. Here, under the particular conditions of this license, as was extensively discussed in the films, if it is an irrelevant patent, it's just an irrelevant patent. Now the only thing that anyone has ever… So inclusion, just so I understand it, inclusion of an irrelevant patent in the pool could be grounds for misuse assuming anti-competitive effects are established. Right, they would have to be very different facts than the fact here. So the key difference… It can't have time misuse because what you're doing is imposing conditions on the licensee  So a horizontal agreement can give rise to misuse with anti-competitive effects. Just like the one I described, a horizontal agreement to effect that can give rise to misuse as long as there are anti-competitive effects. I understand your point. I just want to be careful about the horizontal versus vertical because I assume you're right that that implies some horizontal agreement but what I was focusing on is the fact that it entails a vertical agreement, if you want to call it that, between the licensors as a group and the licensee and that's where I think you get the nexus that's necessary for misuse. The fact that you are imposing the conditions on the licensee in a way that broadens one of the license patents that gives you the potential nexus for misuse. It's not the fact that the licensors have to come to an agreement in order to move in the pool. Mr. Dumont, much of our conversation with you has been more focused on antitrust than patent misuse. Looking at it from that broad scope, do you see pro-competitive as well as anti-competitive implications in the sort of fact patterns we've been discussing? And what are they? I'm not quite sure I follow your question. What pro-competitive implications were there and what happened between Sony and Philips? We started with the fact that they created the CD. We move forward with the fact that they then jointly worked on CDR and CDR-level technology and created that. And by the way, the market was infirm at the time. It's not as though there weren't other technologies out there competing. There were, and some of them were from Sony, by the way. So just in case anyone thinks we weren't competing with Sony, we were doing both. But the pro-competitive benefits that came out of that collaboration included the genesis of the technology and then you move forward to the putting together of the standard and of the joint license that enabled that standard. And you can look at our facts data. So you have a situation where the technology comes out of nowhere and goes from discs being $4 to $7 a disc in 1995, I think it is, down to the time when the reason we have this entire fight with Pringles is the price of the discs goes down to pennies and they then complain that the royalty is too high. I have a question that's been answered. Time has expired. Thank you, Your Honor. Thank you very much. Mr. Wiesenberg, we gave your opponents a minute of extra time and we put a couple minutes of your time with further questioning that you had thought to reserve. So we'll give you two extra minutes from the floor that were still left. You've got six minutes on the bus. Thank you, Your Honor. A couple of quick points. On the issue of what did we elect, let me just read a couple of passages. For the record, this is a pleading to the commission under the facts section of our first finding of the commission on remand, and the caption of that facts section says horizontal agreement between Philips and Sony. And for A6817, Philips reached agreements with Sony and Telly Uden, which allowed Philips to license the three companies' patents related to CDR technology. That can only relate to the 1993 agreement. At A6819, Philips, Sony, and Telly Uden agreed to license... One second. Did that 1993 agreement include the Lacodec patent? It did. It did? Yes. Because that's not clear on the record, but it did. Very good. It is our contention it did. We believe it did. On A6819, Philips, Sony, and Telly Uden agreed that licenses to their CDR patents would be made available only in a mandatory package for license agreement. That can only refer to the 1993 agreement. The suggestion that we did not make this argument below just doesn't hold up to scrutiny. We identified that there was an agreement, a partisan agreement, a consideration for the agreement, a motivation for the agreement, how the agreement was executed, and the consequences of the agreement, and the agreement is in the record. Are we talking about more than one agreement? In the earlier exchange, it sounded to me like some references when the word agreement was used were to the written agreement that created the pool. But some other references seem to apply to some side agreement, and presumably all that could be characterized as an agreement to suppress. Which are you talking about? All of that flows from the 1993 agreement. The setting up of the pool, the agreement not to compete, the granting to Philips and Sony the right to license Sony's patents, all come from the 1993 agreement. That's the agreement we're referring to. There was another issue... So there's only one agreement here, not two, but it's just the written agreement that created the pool. That's right. So you say that that agreement on its face constitutes an agreement to suppress an alternative technology. We have to go a little further than that. Well, that's what I'm asking about the side agreement to suppress as being an extension of the written agreement. There is no side agreement to suppress. The only thing, and this goes to Mr. DeMock's argument about what our burden is, we believe we have shown an agreement between two competitors. One of those competitors has market power. They agreed to suppress technology. They agreed that the LATIC Act couldn't be used within the pool and can't be used without. That on its face shows that the Philips patents have effectively been expanded. It shows that Philips has broadened its patents. It shows that Sony's been removed as a competitor. It shows that nation technology has been suppressed. All of these make out a minimum of the presumptively unlawful agreement that under the FTC's formulation clearly requires shifting of the burden. So the bottom line is you're saying the written agreement is a presumptively unlawful agreement and therefore you don't have to prove any competitive effects. The other side has to come forward with pro-competitive effects. We did show more than that. It's the agreement with the recognition that LATIC and Rainmaker patents were alternative technologies to the same problem. You wouldn't get that from the agreement. That's why I'm saying there's a little bit more. Where do I get it? If I don't get it from the FTC agreement, where do I get it? It's all over the record. We've pointed out, they don't deny, that the technology is distinct. One is an analog solution, one is a digital solution. Well, there was an issue I thought about whether the LATIC-type solution was even viable, much less commercially competitive at some future date. Well, certainly the technical viability, I hope I answered that in my earlier presentation. I think there could be no doubt that it clearly surpasses the threshold of whether or not the ITC said, whether or not it was clearly incapable of viability. I mean, they said how it sounds. Do you agree it has to be shown to be potentially competitive? I think it needs to be shown that it's potentially workable, that there is some... But not necessarily commercially competitive. If it works scientifically, that's enough. That's correct, and this is... And you think you've proved that now? Absolutely, no doubt. That threshold we clearly did surpass. I think there's a remaining issue here, and I want to read again what Philip said about these patents. They are not joint assets. These patents did not come out of a collaborative process. Again, as they say, it is important to stress that the pure CDR patents do not embody the result of joint research or development of Sony, Phillips, and Tayug. These assets are not joint venture assets. The agreement to suppress, the agreement to pool was seven years after these patents were conceived and then filed. Was there ever a joint agreement to do joint technological development? There was in 1979, but nobody has alleged that these are joint inventions. So any discussion of joint invention is clearly not what LACADEC is. Nobody says those are joint inventions. There's been some discussion about antitrust law. Let me read a passage from the Illinois Tool Case, and this is Judge Stevens says, It would be absurd to assume that Congress intended to provide that the use of a patent that merited punishment as a felony would not constitute misuse. And there's a use of patents. Was that a majority opinion? Yes. And here, I hope I have set out why it was that these patents were used, the Phillips patents were used. They lie at the core of everything they were able to get Sony to do, from the enticement to the consideration. And on one final issue, somebody raised whether or not there was ever a misuse case that didn't involve an imposition on the licensee, and I would refer you to the Compton case that we discussed. That's where the licensor agreed not to compete. There was no imposition forced on the licensee. All right, time has expired. We thank all three counsel. The appeal is submitted. Thank you. All rise. Your Honor, the court has adjourned until tomorrow morning at 10 a.m.